## Cornwell's Appeal.

If one of two principal debtors binds himself to the other to pay the whole debt, and gives as security a judgment therefor, the creditor of both is entitled to the benefit of that security; and if there be a surety of the two principal debtors, who was compelled to pay the debt, he would be entitled to the benefit of that security for the purpose of reimbursing himself.   But if, after the surety has paid the money, he takes a bond or other security from one of the principals therefor, he thereby releases the other principal and all rights which he might otherwise have to resort to any security which he had previously given.

In the appropriation of the proceeds of a sheriff's sale, the court will not exercise its equitable power to set-off the mutual claims of individuals, unless they have judgments against each other for their respective claims.

A voluntary deed of assignment, made for the benefit of creditors, after the passage of the Bankrupt Law of the 19th August 1841, and which gives a preference to one creditor over another, is a fraud upon that law, and the assignees in bankruptcy are entitled to recover the assets thus previously transferred.

APPEAL from the decree of the Court of Common Pleas of *York* county, in the matter of the appropriation of the proceeds of the sale of the real estate of William C. Cornwell.   The facts of this case are all fully stated in the opinion of the court.   The cause was argued by

*R. J. Fisher*, for the assignees in bankruptcy.
*Mayer*, for the appellees Loucks and Becker.

The opinion of the Court was delivered by

KENNEDY, J. — By the decree of the court, $5256.34 of the money were appropriated to the payment of the four judgments in favour of John Gamber, assigned by him the 6th of May 1836 to George Loucks and Henry Becker.   These judgments, as Callicott alleges, were either previously paid or satisfied in some way, or void because entered without authority, and upon this ground he appealed from the decree of the court; but he has failed to show that the facts upon which he grounded his appeal are true, and therefore his appeal is dismissed, with the costs accruing thereon to be paid by him.   But John Gamber had another judgment against William C. Cornwell, No. 248 of April term 1834, which he also assigned on the 6th of May 1836 to George Loucks and Henry Becker.   Upon this judgment there were due, at the time the money for distribution was made, $2168.62, which the court decreed to be paid to Loucks and Becker as assignees of the judgment.   This judgment was given, as has been shown, by William C. Cornwell to John Gamber, to secure the payment of three several bonds of $400 each, given by the said John Gamber

VII. — 39                    2 A *

and William C. Cornwell jointly, with Arthur Patterson as their surety, to Abraham Heistand. Cornwell, however, failed to pay these bonds, in consequence of which the executors of Arthur Patterson, the surety therein, were sued by Heistand or his assignee, and compelled to pay them, who, upon being obliged to do so, called upon John Gamber for reimbursement of the moneys so paid by them; Gamber accordingly paid them above one-half the amount, and gave them his bond for the payment of $825, the residue thereof, at a future day, which still remains unpaid. But George Loucks and Henry Becker, at the time they obtained from John Gamber the assignment of the judgment No. 248 of April term 1834, agreed under their hands and seals to indemnify and save him (John Gamber) harmless from all such loss, damages or payments of money on account of the three bonds before mentioned, in which Arthur Patterson was surety for Gamber and Cornwell, the same as the judgment itself No. 248 of April term 1834 would have secured or indemnified Gamber, holding its place *pro rata* with the other judgments of the same date. On the 9th of April 1838, the executors of Arthur Patterson satisfied the judgment, which then amounted to upwards of $2100, obtained against them on account of their testator's suretyship, as before mentioned, for Gamber and Cornwell, to Heistand. After this, though the precise date does not appear, Gamber repaid the executors the larger portion of the amount so paid by them, and gave them his bond payable at a future day for the residue thereof, amounting to $825. Some time after this, he, on the 15th of October 1841, voluntarily executed a deed conveying and assigning all his property and effects to Jacob H. Gamber and Abraham Peters in trust for the benefit of his creditors, but giving preferences to some over others, to the amount of $58,325; and again on the 17th November 1842 he filed his petition for the benefit of the Bankrupt Law, and on the 20th January 1843 was declared a bankrupt, and John Glenn and James Mason Campbell were appointed his assignees. The sale, however, of the real estate of Cornwell, from which the money in question was raised, was made by the sheriff on the 28th day of February 1839, previously to these latter proceedings; after which Loucks and Becker, on the 10th of May 1839, obtained an assignment "for value received," as alleged on the face thereof, of an agreement made by John Gamber, under his hand and seal, on the 9th day of October 1835, with John Evans and John L. Mayer, in the following words:

"In consideration of services and counsel of John Evans and John L. Mayer, I hereby promise and agree to pay to them, in ten days after the confirmation of the sale of the property of William C. Cornwell, and, if it should not be sold, then ten days after my judgments shall be otherwise satisfied, a sum of money which shall be equal to 10 *per cent.*, or such sum as may be reduced or deducted, directly or indirectly, from the liens or judgments now

against William C. Cornwell, dated before the 21st of May 1834, except the judgment of J. B. Webb and of J. Lewis, given to secure Creary's draft; and also a further sum equal to 3 *per cent.* on the amount of my judgment against William C. Cornwell now existing, excepting the credits of $2743 entered on the docket, and of $1500 besides not entered. Witness my hand and seal, this 9th day of October 1835."

Upon these facts the different claims by the several parties are made to the $2168.62 coming to the judgment No. 248 of April term 1834. First, by Patterson's executors to the $825 thereof, with interest thereon to the date of the sheriff's sale, in discharge of their claim for moneys paid by them on account of their testator's suretyship for John Gamber and William C. Cornwell. Second, by Jacob H. Gamber and Abraham Peters, trustees of John Gamber under the voluntary assignment made by him, to the whole amount coming on said judgment. Third, by John Glenn and James Mason Campbell, assignees of John Gamber under the Bankrupt Law, to the whole amount thereof. And, fourth, by Loucks and Becker, the appellees, to the whole amount, under their assignment from John Gamber of the judgment itself; and if not entitled to be preferred to the claim of Patterson's executors, then to the residue of the money applicable to said judgment, by virtue of the assignment from John Gamber of the same judgment, and of the claim which they have against John Gamber under the assignment from Evans & Mayer of his obligation to them.

We will consider the several claims in the order in which they have just been mentioned, which brings the claim of Patterson's executors first to notice. Were it not for the settlement which they made with John Gamber, one of the principals for whom their testator was surety, and the bond which they thereupon took of him, securing to them the payment of the balance which remained unpaid by him to them at the time, it would seem pretty clear that they would have a right upon equitable principles to claim the benefit of the judgment in question, or a right to receive so much of the money upon or coming to it, as would be sufficient to satisfy the balance of the money paid by them on account of their testator's suretyship for John Gamber and William C. Cornwell. The bond upon which this judgment was entered was taken by Gamber of Cornwell for the purpose of securing Gamber, as between him and Cornwell, against the payment of the bonds or money for which Patterson was their security to Heistand, and in truth was given expressly " as security for payment of three several bonds, given by William C. Cornwell and Gamber (joint partners) to Abraham Heistand of York county, with Arthur Patterson as surety, &c." Heistand, had he not been paid, might no doubt have claimed the benefit of this bond and the judgment obtained upon it, upon the well-established principle in equity that a cre-

ditor is entitled to all the securities taken by the surety of his debtor, either for the purpose of securing the payment of the debt to the creditor, or for the purpose of indemnifying himself against the payment of it. *Maure* v. *Harrison*, (1 *Eq. Cas. Abr.* 93); *Wright* v. *Morley*, (11 *Vez.* 12); *Pitman on Principal and Surety* 88–9. So, upon the other hand, if the creditor obtains any additional security subsequently from the principal debtor, and the original surety is compelled to pay the debt, he will be entitled upon principles of equity to the benefit of the additional security obtained of the principal debtor by the creditor. *Cragthorne* v. *Swinburn*, (14 *Vez.* 162); *Parsons* v. *Biddock*, (2 *Vern.* 608); *Mayhew* v. *Crickel*, (2 *Swart.* 185). See also *Pitman on Principal and Surety* 173, and the cases there referred to. And so in the case where there are two principal debtors and a surety, and by an arrangement made between the two principal debtors, as in this case, one of them binds himself to the other to pay the whole of the debt, and gives his judgment-bond, upon which a judgment is entered immediately binding his real estate for the payment of it, the creditor in the first place, if the judgment thus procured should become requisite for the payment of his debt, might, as I apprehend, have the benefit of it for that purpose; but if he looks to the surety and obtains payment from him, then I apprehend that the surety may claim the benefit of the judgment taken by the one principal debtor of the other, for the purpose of obtaining by means of it a reimbursement of the money paid by him as surety. *Erb's Appeal*, (2 *Penn. Rep.* 298). In ordinary cases, where the surety has paid the debt, he is entitled to recover from the principal in an action of *assumpsit* the money so paid by him, upon the ground that, in the absence of an express stipulation between the parties, a promise is raised by *implication of law* on the part of the principal to repay the money so paid by the surety for the principal's use. *Toussaint* v. *Martinant*, (2 *T. R.* 100). But this rule only applies where no other remedy exists; for if the surety take from his principal any security upon which he may proceed for the recovery of the money paid by him, he cannot resort to an action of *assumpsit*, but is left to the remedy given him by the security which he has thought proper to take. *Toussaint* v. *Martinant*, (2 *T. R.* 100); *Crafts* v. *Tritton*, (8 *Taunton* 365); *S. C.* 2; *J. B. Mas.* 411. The executors of Arthur Patterson might, therefore, after having paid the money to Heistand or his assignee, for which their testator was surety for John Gamber and William C. Cornwell, have maintained an action of *assumpsit* for the recovery thereof against Gamber and Cornwell jointly; but by receiving payment from Gamber in part, and taking his bond allowing him time for the payment of the residue, they thereby released Cornwell from his liability to them, and put it in the power of Gamber to proceed against Cornwell for indemnity in such manner as he might think most advisable. The executors

[Cornwell's Appeal.]

of Patterson having taken the bond of John Gamber alone as their only security for the payment of the residue of the money paid by them to Heistand's assignee, thereby dissolved all connection with Cornwell, and relinquished all claim which they otherwise might have had in equity to the bond of indemnity and judgment thereon, which John Gamber had taken of William C. Cornwell upon his selling out to him all his interest in their joint property and concern. John Gamber having thus satisfied the executors of Patterson, his voluntary assignees or his assignees in bankruptcy must be considered as entitled to receive the money applicable to this judgment, unless Loucks and Becker are entitled to it by virtue of their assignment of the judgment from Gamber. Now, although John Gamber assigned the judgment to Loucks and Becker, it was not done in consideration of money or money's worth paid or to be paid by them to him, but merely in consideration of their agreement to keep and save him harmless from all claim by the executors of Patterson, in the same manner that he might have done himself by means of the judgment, had he not assigned it to them, in case Cornwell failed to pay the amount of the three bonds to Heistand in which Patterson, the testator, was surety for Gamber and Cornwell. Loucks and Becker failed entirely in this respect to keep or perform their agreement with John Gamber. On the contrary, they suffered Patterson's executors to be sued for the money due on the three bonds, and to be compelled to pay the same; after which, in order to obtain reimbursement, the latter had to call upon John Gamber, who was obliged to satisfy them in the manner that has been stated. The assignment of the judgment to Loucks and Becker only gave them at most an equitable right to receive the money which might at any time become due on the judgment, by their either paying the three bonds held by Heistand or his assignee, or reimbursing Patterson's executors; but in this respect they have wholly failed to fulfil their agreement with Gamber, which was the only consideration for the assignment of the judgment in question. It is clear, therefore, that they can have no right, either in law or equity, to recover the money coming on it. But notwithstanding they failed to comply with the terms and conditions upon which they obtained the assignment of the judgment from Gamber, they still insist that they are entitled to receive the amount of it in order to satisfy the covenant entered into by Gamber with Evans & Mayer, who on the 9th of May 1839 assigned the same to Loucks and Becker. This assignment can at most only be regarded as an equitable assignment of the claim of Evans & Mayer against John Gamber; but in what way it is to give Loucks and Becker a right to receive the money coming on the judgment in question, it is difficult to conceive. By virtue of the assignment they can have no claim beyond what might have been claimed by Evans & Mayer. But it will scarcely be pretended that these latter gen-

tlemen could have come into court and claimed to be paid the amount of their claim out of the moneys coming upon the judgment. If they had had a judgment against Gamber, and Gamber a judgment against them, then the court might have interfered upon the application of either party against the other, and have directed a satisfaction of the judgment to be made by setting the one off against the other, if of equal amount, or, if of unequal amount, then a satisfaction of the lesser by defalcating it from the larger, and thus also producing a satisfaction of the larger, *pro tanto*. But it is not for a court to interfere, and by an exercise of its equitable powers order or direct the mutual claims between even the same persons to be set-off, unless they have judgments against each other for their respective claims. But this is not the relative situation of either Evans & Mayer and Gamber, or of Loucks & Becker and Gamber. Loucks and Becker have therefore no right on the ground of set-off, or upon any other, as it appears to me, to receive the money coming on the judgment in question. Indeed, if the court could interfere and give this money, or any portion of it, to any one, on the ground that he is or was a creditor of John Gamber at the time it was raised by the sheriff's sale, the claim of the executors would seem to be entitled to a preference. Besides, it may be observed that at the time the money was raised by the sheriff's sale, which was on the 28th of February 1839, Loucks and Becker had no claim either in law or equity against John Gamber. It was not until the 9th of May following that they obtained from Evans & Mayer an assignment of their claim against Gamber, and then no doubt obtained it with a view to bolster up their claim to the judgment in question under the assignment of it to them from Gamber. But it being no lien on the money in court, or connected with the consideration upon which Loucks and Becker obtained the assignment of the judgment No. 248 of April term 1834, the court cannot with any propriety take cognizance of it.

Seeing then that Loucks and Becker failed entirely to pay Heistand or his assignee the bonds in which Arthur Patterson was bound as surety for Gamber and Cornwell, and to reimburse or satisfy the executors of Patterson after they had been compelled to pay these bonds, and that John Gamber, in consequence of their failure to do so, became entitled to the benefit of the judgment No. 248, in the same manner as if he had never assigned it to Loucks and Becker, and to receive the money coming thereon, his right to receive the money must be considered as either passing to his assigns under the voluntary deed of trust executed by him on the 15th of October 1841, or to his assignees on his being declared a bankrupt subsequently, on the 20th of January 1843. His voluntary deed of assignment would have been unquestionably good according to the well-settled law of this State, notwithstanding the preferences contained in it in favour of some of his credi-

tors, and would have given the trustees therein named an undoubted right to receive the money coming on the judgment in question, No. 248. But it is claimed by the assignees in bankruptcy that this assignment is rendered void by the 2d section of the Bankrupt Act, passed the 19th of August 1841, which took effect from and after the 1st day of February then next following. By the 2d section it is, among other things, enacted "That all *future* payments, securities, conveyances or transfers of property, or agreements made or given by any bankrupt, *in contemplation of bankruptcy*, and for the purposes of giving any creditor, endorser, surety or other person, any *preference* or *priority* over the general creditors of such bankrupt, &c., shall be deemed utterly void, and a fraud upon this Act; and the assignee under the bankruptcy shall be entitled to claim, sue for, recover and receive the same as part of the assets of the bankruptcy; and the person making such unlawful preferences and payments shall receive no discharge under the provisions of this Act: Provided, that all dealings and transactions by and with any bankrupt, *bonâ fide* made and entered into more than two months before the petition made and filed against him, or by him, shall not be invalidated or affected by this Act. Provided, that the other party to any such dealings or transactions had no notice of a prior Act of Bankruptcy, or of the intention of the bankrupt to take the benefit of this Act. And in case it shall be made to appear to the court, in the course of the proceeding in bankruptcy, that the bankrupt, his application being voluntary, has, subsequent to the 1st day of January last, or at any other time, in contemplation of the passage of a Bankrupt Law, by assignments or otherwise, given or secured any preference to one creditor over another, he shall not receive a discharge unless the same be assented to by a majority in interest of those of his creditors who have not been so preferred. And provided also, that nothing in this Act contained shall be construed to annul, destroy or impair any lawful rights of married women or minors, or any liens, mortgages or other security or property, real or personal, which may be valid by the laws of the States respectively, and which are not inconsistent with the provisions of the 2d and 5th sections of this Act." And by the 5th section it is further enacted, "That all creditors coming in and proving their debts under such bankruptcy in the manner hereinafter described, the same being *bonâ fide* debts, shall be entitled to a share in the bankrupt's property and effects *pro rata, without* any *priority* or *preference* whatsoever, except only for debts due by such bankrupt to the United States, and for all debts due by him to persons who, by the laws of the United States, have a preference in consequence of having paid moneys as his sureties, which shall be first paid out of the assets; and any person who shall have performed any labour as an operative in the service of any bankrupt shall be entitled to receive the full amount of the wages due to

[Cornwell's Appeal.]

him for such labour, not exceeding $25, provided that such labour shall have been performed within six months next before the bankruptcy of his employer." If by the words " all *future* conveyances or transfers," employed in the first clause of the 2d section, is to be understood all conveyances or transfers of property made at any time after the passage of the Act by a bankrupt in contemplation of bankruptcy, and for the purpose of giving any creditor, &c. any preference or priority over the general creditors of such bankrupt, it is clear that the voluntary assignment made by John Gamber must be considered void and a fraud upon the Act. And this, from the general import as well as the language of the whole Act, would seem to be the natural meaning of the words, were it not for the last section, which enacts " That this Act shall take effect from and after the 1st day of February next;" that is, February 1842, some three and a half months after the execution of the voluntary deed of Gamber transferring his property to trustees for the benefit of his creditors, and giving preferences to some of them over the rest. If, then, the Act was not to take effect, as is expressly declared by the last section thereof, until after the 1st day of February 1842, the question arises whether it would not be giving effect to it before that time to hold such deeds, made after the passage of the Act, but before the time fixed for its taking effect, void and a fraud upon the Act. Perhaps it would, if the last section is to ride over and control every provision and expression contained in the Act. But this, it is conceived, would be contrary to the plain meaning and intention of the Legislature, expressed in terms in several parts of the Act that cannot well be misapprehended. Indeed, it is perfectly obvious that the great design of the Act was to prevent debtors in insolvent circumstances giving preferences to some of their creditors over others, with the exception of those expressly provided for therein, so that each creditor should receive a *pro rata* proportion of the moneys made out of the debtor's property and effects, and the debtor, at the same time, who had not attempted to give preferences contrary to the spirit and meaning of the Act, and acted otherwise fairly towards his creditors, a release or discharge from the debts owing by him to them respectively. But to hold transfers made by a failing debtor of his property and effects to trustees for the benefit of his creditors, giving preferences to some over others, between the date of the passage of the Act and the time fixed for its taking effect, to be good and available, would not only be giving him time to prevent his creditors from coming in and receiving a *pro rata* share of his property and effects towards payment of their debts, but might in many instances encourage him to do so. But with a view to deter him from doing anything of the sort, it is expressly provided in the 2d section, as we have seen, that the bankrupt, if his application be voluntary, shall not be entitled to a discharge under the Act if it shall appear to the

court that he had, subsequently to the 1st day of January preceding the passage of the Act, or at any other time, in contemplation of the passage of a Bankrupt Law, given or secured any preference to one creditor over another, unless his discharge shall be assented to by a majority in interest of those of his creditors who had not been preferred. Being thus expressly denied the benefit of a discharge under the Bankrupt Law, where he had *at any time before* the passage of it given or secured a preference to one creditor over another, in contemplation of the passage of a Bankrupt Law, it can scarcely be doubted that the Legislature intended to go further in case of his having given such preference after the passage of the Act, though before it had taken effect, and to declare all preferences so made void and a fraud upon the Act. We therefore consider that the assignees of John Gamber in bankruptcy are entitled to receive the money coming on the judgment No. 248 of April term 1834, and accordingly decree that the same be paid to them, reversing the decree of the court below.

Decree reversed.